**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**
www.flsb.uscourts.gov

In re:

Marquis Star Holding, Inc. and
Marquis Solar Frame Works, Inc.,

Debtors.
_______________________________________/

Case No.: 26-10660-RAM

Chapter 11

(Jointly Administered)

Marquis Star Holding, Inc. and
Marquis Solar Frame Works, Inc.,

Plaintiffs,

v.

Export Development Canada,

Defendant.
_______________________________________/

Adv. No.: 26-01176-RAM

**DEFENDANT'S MOTION TO DISMISS OR TRANSFER**
**VENUE AND REQUEST FOR JUDICIAL NOTICE**

Export Development Canada ("EDC")[1] respectfully files this Motion to Dismiss or Transfer Venue and Request for Judicial Notice (the "Motion") and states as follows:

**RELIEF REQUESTED**

1. EDC respectfully moves to dismiss this action for failure to state a claim (Points 1 & 2, *infra*) and insufficient service (Point 3, *infra*). Alternatively, EDC requests that venue be transferred to the Plattsburgh Division of the Northern District of New York, which is within 100 miles of Montreal, so EDC can try to get evidence in the control of the Debtors' owner, Zhong Li a/k/a John Lee ("Mr. Li"), which is indispensable to EDC's defense of this action. Point 4, *infra.*

[1] EDC does not waive any rights in this action, including to the Court's jurisdiction, and files this paper solely in furtherance of protecting its jurisdictional and other objections to this action, and to avoid any arguable waiver of rights under the scheduling order, Adv. Dkt. # 3.

## INTRODUCTION

2. The genesis of this entire chapter 11 case is Mr. Li's decision not to pay one of his Chinese suppliers a $10 million debt, and to have EDC pay it instead. This action posits that legal sophistry, combined with Mr. Li's refusal to provide discovery here or in the main case, can relieve him of any obligation to pay that debt and advance his abuse of the United States bankruptcy system to reorganize his family business at EDC's expense.

## FACTUAL BACKGROUND OF EDC'S CLAIM

3. The Debtors are co-indemnitors of several entities that, at all relevant times, were owned and controlled by Mr. Li, his wife Wei Lu a/k/a Wei Li ("Mrs. Li"), and their son Richard.[2] The Debtors' Complaint calls these entities the "Sinobec Entities" and notes they are in CCAA insolvency proceedings in Canada. Complaint, ¶ 10, and n. 3. Mr. and Mrs. Li are being sued in those proceedings for defrauding the Sinobec Entities' creditors.[3]

4. Mr. and Mrs. Li (and presumably Richard) also own Debtors Marquis Solar Frame Works, Inc. ("Marquis Solar") and Marquis Star Holding, Inc. ("Marquis Holding").[4] And Mr. Li, though no longer officially their CEO, still controls the Debtors' high-level business decisions[5] and presumably this action through his Canadian lawyers[6] and proxy officers.[7]

---

[2] Dkt. # 159-7, ¶ 15 (Mr. Li's declaration filed in CCAA chapter 15 recognition proceedings).
[3] Dkt. # 280-5 (CCAA June 12th *ex parte* and July 9th *inter partes* asset-freezing T.R.O.'s).
[4] Dkt. # 280-8, ECF p. 57 (organizational chart in 2025 forensic report of CCAA Monitor).
[5] Dkt. # 96-2, at 22:11–25:15 (testimony at meeting of creditors showing how Mr. Li dominated the Debtors' postpetition DIP financing proposal).
[6] *See e.g.*, Dkt. # 128, at ECF p. 13, ¶ 2 ("communications concerning intercompany . . . transfers have been conducted exclusively with Canadian counsel, not with Mr. Li himself."); Uzzi Report, Dkt. # 219, at ECF pp. 10, 17, 22, 27, 31, 40, 52, 55, & 58–59 (fourteen references to "[a]ccording to counsel to the Related Parties . . . ").
[7] *See e.g.*, Dkt. # 96-6, at 39:23–40:06 (Marquis Holding's nominal CEO testifying that all her direction comes through lawyers); Dkt. # 280, ¶¶ 35–37, 40–42, & 132–43 (examples of false testimony by Mr. Li's proxy officers concealing his actions).

5. The Debtors and the Sinobec Entities are jointly liable to EDC under an indemnity agreement (the "Indemnity") they co-signed between 2019 and 2023.[8] Before their CCAA insolvency, the Sinobec Entities were "a leading . . . aluminum supplier[.]"[9] And Marquis Solar, which is the Debtors' operating entity, runs "a manufacturing business engaged in the fabrication . . . of aluminum solar panel frames."[10]

6. To assure its foreign aluminum suppliers of payment, the Sinobec Entities needed Bank of Montreal ("BMO") to issue letters of credit naming its suppliers as beneficiaries. Like any bank, BMO would not issue letters of credit ("LOCs") unless it knew it would be repaid if the Sinobec Entities' suppliers drew on the LOCs. As a result, Mr. Li turned to EDC.

7. At Mr. Li's request,[11] starting in 2019, EDC gave BMO a guaranty of payment for the Sinobec Entities' LOCs (the "APSG").[12] In turn, the Sinobec Entities signed the Indemnity with EDC, which obligated them to repay EDC for any sums EDC paid BMO under the APSG if the Sinobec Entities' suppliers drew down on the LOCs.[13]

8. "In late 2023, Sinobec Group sought renewal of the LOCs . . . which . . . would lead to a renewal of the APSG between EDC and BMO." Complaint, ¶ 13. EDC started this renewal process in July 2023.[14] During that process, "EDC learned that materials the Debtors' affiliate was importing [thanks to the APSG] were being used in the [Debtors'] operations[.]"[15]

9. That affiliate was Sinobec Trading Inc. ("Sinobec Trading"), which is one of the

---

[8] Ex. A (Indemnity Agreement with EDC, co-signed by the Debtors at p. 7).
[9] Dkt. # 159-7, ¶ 8 (Mr. Li's declaration filed in CCAA chapter 15 recognition proceedings).
[10] Dkt. # 4, ¶ 4 (Debtors' January 20th motion for joint administration).
[11] *See*, Ex. B, p. 3 (August 2019 application to EDC, signed by Mr. Li).
[12] Ex. C (the APSG).
[13] Ex. A, p. 2, section 3(1) (Indemnity Agreement).
[14] Ex. D, p. 29 (July–December 2023 emails between EDC, the Debtors, and Sinobec Entities).
[15] Dkt. # 150-3, at ¶ 4 (Declaration of Mathew Foubert, senior underwriter at EDC).

Sinobec Entities. Complaint, p. 5, n. 3. Like the other Sinobec Entities, it was run by Mr. Li and owned by him, Mrs. Li, and Richard Li.[16] In 2024, Sinobec Trading applied to BMO for three LOCs to buy aluminum from Marubeni Itochu Steel (Shanghai) Co. Ltd. ("Marubeni").[17] Under the APSG, EDC gave BMO a guaranty of coverage for these LOCs.[18]

10. Sinobec Trading then failed to pay six Marubeni invoices[19] and Marubeni drew on the LOCs.[20] *See*, Complaint, ¶ 16 ("Due to non-payment by Sinobec Trading, Marubeni drew down on the LOCs . . . totaling USD $9,872,197.22[.]"). "After the Marubeni Drawdowns, BMO demanded payment from EDC under the APSG." Complaint, ¶ 16. "EDC made payment on BMO's request and . . . then made written demand of Debtors under the Indemnity . . . for USD $9,872,197.22 . . . representing the amount it paid BMO[.]" Complaint, ¶ 16.

**1. The Debtors' claims that EDC breached the Indemnity should be dismissed with prejudice because they are irreconcilable with the terms of the Indemnity, the APSG, and the LOCs.**

11. When considering a Rule 12(b)(6) dismissal motion, "courts must consider the complaint . . . as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Although the Debtors' Complaint only attaches the Indemnity, it relies on various documents which should be deemed incorporated by reference (including the APSG,[21]

[16] Dkt. # 159-7, ¶ 1 & n. 1; *see also*, ¶ 15 and signature block at p. 16 (Mr. Li's declaration filed in CCAA chapter 15 recognition proceedings); *see also*, Dkt. # 280-8, ECF p. 55 (organizational chart in 2025 forensic report of CCAA Monitor).
[17] Ex. E (Letters of Credit issued by BMO and identifying Sinobec Trading as the "applicant").
[18] Ex. F (Certificates of Coverage for the three LOCs).
[19] Ex. G, pp. 4–5, 10, 15–16, & 21 (Marubeni draws submitted to BMO, with unpaid invoices).
[20] Ex. G, pp. 1–6 (1st draw), pp. 7–11 (2nd draw), pp. 12–17 (3rd draw), pp. 18–22 (4th draw).
[21] Complaint, ¶¶ 12–13, 16, 20, 23–25, 29, 60–62, 70, 74–76, and 80 (citing the APSG).

the LOCs,[22] and the Marubeni drawdowns.[23]).

12. "Under the incorporation-by-reference doctrine, a district court may consider evidence attached to a motion to dismiss . . . if the document is (1) central to the plaintiff's claim; and (2) undisputed, meaning that its authenticity is not challenged." *Swinford v. Santos*, 121 F.4th 179, 187 (11th Cir. 2024). It is not necessary that the complaint refer to a document for it to be incorporated by reference. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 n. 6 (11th Cir. 2024). Alternatively, the Court should take judicial notice of *at least* Exhibits C, E, F, G, and I.

13. The Debtors' breach of contract/gross negligence claims assert that BMO did not have to pay Marubeni because its draws did not comply with the LOCs. As a result, EDC did not have to pay BMO under the APSG. And in turn, the Debtors' liability to EDC under the Indemnity should not have arisen. *See*, Complaint, ¶¶ 21–31, & Count V, Grounds One (¶¶ 60–62), Four (¶ 69), Five (¶ 70), and Eight (¶¶ 75–76) (together, the "Breach of Contract Claims").

14. The Debtors' Breach of Contract Claims should be dismissed *with* prejudice because they (A) are foreclosed by the plain language of the Indemnity, (B) rely on asserting *EDC's rights* against BMO under the APSG, and (C) misconstrue the language of the APSG, which shows BMO *did* "strictly comply" with the LOCs (and did so in the coverage period).

**A. The Debtors' Breach of Contract Claims are foreclosed by the express terms of the Indemnity.**

15. Based on the plain language of the Indemnity, EDC only has to prove that (1) BMO made a claim under the APSG, and (2) EDC paid it. As the Indemnity states:

> In consideration of the issuance of any Bonding Product [*i.e.*, the APSG], the Indemnitor(s) hereby jointly and severally . . . agree to fully indemnify EDC against all claims . . . made in respect of a Bonding Product, including the amount that EDC pays under any Bonding Product[.] Ex. A, p. 2, s. 3(1).

[22] Complaint, ¶¶ 11–13, 16, 21–22, 27, and 61 (citing the LOCs).
[23] Complaint, ¶¶ 16–17, 25, 47, 53, 61, 69–70 (citing the Marubeni drawdowns).

16. The Complaint identifies the APSG as the "Bonding Product" referenced in the Indemnity. *See*, Complaint, ¶¶ 74–75. And the Debtors *admit* BMO made a claim under the APSG and EDC paid it. *See*, Complaint, ¶ 16 ("BMO demanded payment from EDC under the APSG [and] EDC made payment on BMO's request.").

17. "Allegations in a complaint are considered judicial admissions." *Tri-Lady Marine, Ltd. v. Bishop Mechancial Servs*., LLC, 2018 WL 10466997, at *3 (S.D. Fla. Sept. 20, 2018), *aff'd*, 763 F. App'x 882 (11th Cir. 2019). The Debtors' admission in paragraph 16 is dispositive of their Breach of Contract Claims by virtue of section 3(1) of the Indemnity.

18. Moreover, in signing the Indemnity the Debtors bargained away the right to insert themselves into EDC's contractual relationship with BMO (under the APSG) as follows:

> The [Debtors] absolutely and irrevocably authorize[] EDC to (i) pay immediately, *at its absolute and sole discretion*, in whole or in part, any amounts claimed pursuant to and in accordance with a Bonding Product, . . . or (iii) *take any other action* in respect of a Bonding Product. Ex. A, p. 2, s. 3(4).

19. Similarly, the Indemnity states that "[e]ach lndemnitor agrees that its liability hereunder shall not be varied or discharged . . . by reason of any indulgence . . . being granted . . . by EDC or by any compromise arrangement . . . whatsoever between EDC" and BMO. Ex. A, p. 2, s. 3(3). Rather, "[t]he [Debtors'] liability . . . shall not be discharged, released, or otherwise terminated *except* by full payment to EDC[.]" Ex. A, p. 2, section 3(3). Taken together, these provisions conclusively bar the Debtors' Breach of Contract Claims.

### B. To circumvent the plain language of the Indemnity, the Debtors try to rely on EDC's rights against BMO under the APSG.

20. The Debtors are not parties to the APSG. Its purpose was to govern *EDC's* relationship with *BMO*. To that end, the APSG contains terms that are meant to protect *EDC* from improper payment demands by BMO. Thus, section 2(1) of the APSG states that:

> . . . EDC hereby unconditionally and irrevocably guarantees to [BMO] the

> payment of the Guaranteed Amount provided that: (1) the payment . . . made by [BMO] to [Marubeni] under the Bank Instrument [the LOCs] or to the Foreign Bank under the Bank Instructions was made in strict compliance with the terms thereof and the demand for such payment was made within the Covered Instrument Validity Period[]. *See*, Ex. C, p. 4.

21. This provision in the APSG is the linchpin of the Debtors' Breach of Contract Claims. Citing it, they allege that "EDC owed a duty of care to . . . only pay those . . . requests from BMO that were 'in strict compliance with the terms' of the applicable 'Bank Instrument' and was made within the 'Covered Instrument Validity Period.'" Complaint, ¶ 23.

22. But the Debtors are not parties to the APSG. They do not allege they are third-party beneficiaries or identify any terms of the APSG that confer any rights on them. Nor could they. *See generally*, Ex. C (APSG). To the contrary, they *admit* that "[t]he primary purpose of the APSG is to set forth the terms *between EDC and BMO*[.]" Complaint, ¶ 12. In sum, the entire purpose of the "strict compliance" provision of the APSG was *to protect EDC.*

23. The Debtors' misplaced reliance on the "strict compliance" term of the APSG is the foundation of their Breach of Contract Claims. *See*, Complaint, ¶¶ 21–31 (relying on "strict compliance" term of APSG to allege gross negligence by EDC); ¶¶ 60–62 (Count V, Ground One, relying on "strict compliance" term of APSG), ¶ 69 (Count V, Ground Four, alleging gross negligence); ¶ 70 (Count V, Ground Five, alleging gross negligence and relying on APSG); and ¶¶ 75–76 (Count V, Ground Eight, relying on APSG). Thus, dismissal *with prejudice* is proper.

### C. Even if the Debtors were entitled to rely on the APSG, their Breach of Contract Claims still fail because BMO *did* "strictly comply" with the LOCs (or, at a minimum, EDC was not "grossly negligent" to pay BMO's claims).

24. The Debtors identify four claims by BMO under the APSG that they allege EDC was "grossly negligent" to pay. Complaint, ¶¶ 26–31. To the extent the Debtors misstate the APSG's terms, their allegations are not entitled to the presumption of truth. *Cf.*, *Warren Tech., Inc. v. UL LLC*, 2018 WL 10550930, at *7 n. 1 (S.D. Fla. Oct. 31, 2018), *aff'd*, 962 F.3d 1324

(11th Cir. 2020) (on motions to dismiss, courts "need not accept factual claims that are internally inconsistent [or] facts which run counter to facts of which the court can take judicial notice[.]")

25. First, as its plain language reflects, the Debtors completely misconstrue the reference to "gross negligence" in the Indemnity. That provision concerns defenses the Debtors might have raised if, for example, EDC let the LOCs lapse due to its "gross negligence" and Marubeni refused to make shipments, causing damages. Ex. A, p. 2, s. 3(3).

26. Regardless, as noted, the APSG required EDC to pay BMO if "(1) the payment . . . made by [BMO] . . . under the Bank Instrument . . . was made in strict compliance with the terms thereof and the demand for such payment was made within the Covered Instrument Validity Period[]. Ex. C, p. 4, s. 2(1). "Bank Instrument" means the LOCs. Ex. C, p. 3, s. 1(4). And Marubeni was the beneficiary under the LOCs. Complaint, ¶ 16.

27. Dispositively, the LOCs all have identical language conclusively negating the Debtors' "gross negligence" and "strict compliance" claims. First, the LOCs all required BMO to honor Marubeni's draws if presented with just *two* documents (identified in bold):

> WE HEREBY ISSUE OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. [ . . . ] IN FAVOUR OF MARUBENI . . . FOR A SUM OF NOT EXCEEDING [ . . . ] . . . AVAILABLE BY BENEFICIARY'S WRITTEN DEMAND MADE ON [BMO] . . . ACCOMPANIED BY THE FOLLOWING DOCUMENT(S).
> **1. BENEFICIARY'S SIGNED STATEMENT** STATING THAT THE AMOUNT OF THIS DRAWING USD . . . . . . UNDER . . . STANDBY LETTER OF CREDIT NO. [ . . . ] REPRESENTS FUNDS DUE TO MARUBENI . . . PURSUANT TO THE ATTACHED UNPAID INVOICE(S) . . . TO SINOBEC TRADING INC.
> **2. COPY OF INVOICE(S) MARKED UNPAID ISSUED BY BENEFICIARY TO APPLICANT STATING PAYMENT DUE WITHIN 120 DAYS FROM THE BILL OF LADING DATE.**

*See*, Ex. E, at pp. 2–3 (LOC No. BMTO806047O5); Ex. E, at pp. 7–8 (LOC No. BMTO806449OS); Ex. E, at pp. 12–13 (LOC No. BMTO806369OS).

28. As the Marubeni draws confirm, they *did* include the two documents required by the LOCs, *i.e.*, the "beneficiary's signed statement" and a "copy of invoice(s) marked unpaid . . . stating payment due within 120 days from the bill of lading date." *See*, Ex. G, pp. 1–6 (1st draw), pp. 7–11 (2nd draw), pp. 12–17 (3rd draw), pp. 18–22 (4th draw). Upon receiving these documents, BMO *had* to honor Marubeni's draws. That is how a letter of credit works.

29. Moreover, all three LOCs have identical language disclaiming any duty on BMO's part to perform the sort of examination of the transactions between Sinobec Trading and Marubeni that the Debtors now say BMO should have undertaken (*see*, Complaint, ¶¶ 26–29):

> EXCEPT FOR THE NAMES AND ADDRESSES OF APPLICANT AND BENEFICIARY APPEARING ON THE . . . BENEFICIARY'S INVOICE[,] ALL THE OTHER DETAILS CONTAINED IN SUCH INVOICE WILL NOT BE VERIFIED BY [BMO].

*See*, Ex. E, p. 3 (LOC No. BMTO806047O5); Ex. E, p. 8 (LOC No. BMTO806449OS); Ex. E, p. 13 (LOC No. BMTO806369OS).

30. Upon receiving invoices marked "unpaid" that *said* payment was due within 120 days from the bill of lading date, there was nothing more for BMO to do. That is the essence of a letter of credit transaction. Even ignoring the express terms of the LOCs, the "independence principle" relieved BMO of any duty to analyze Marubeni's contractual obligations to Sinobec Trading. *See e.g.*, *Great Wall De Venezuela C.A. v. Interaudi Bank*, 117 F. Supp. 3d 474, 484 (S.D.N.Y. 2015) (explaining independence principle and noting that the "bank's obligation to honor drafts drawn on a letter of credit . . . is separate and independent from any obligation of its customer to the beneficiary under the sale of goods contract[.]").

31. Given the express terms of the LOCs, if BMO had *not* honored Marubeni's draws, Marubeni could have sued BMO. *See generally*, *id*. Likewise, if EDC had not paid BMO's claims, BMO could have sued EDC under the APSG. As usual, the only party that didn't honor

their contractual obligations was Mr. Li (Sinobec Trading). And if Mr. Li thought Marubeni's draws were improper, Sinobec Trading or the Debtors would have sued BMO. They never did.

32. The Debtors also misstate or misinterpret the requirements of the APSG with respect to the "Covered Instrument Validity Period" referenced in section 2(1) of the APSG. Ex. C, p. 4. They admit that "Covered Instrument Validity Period" is "a defined term under the APSG." Complaint, ¶ 24. But they fail to attach the APSG or disclose the definition.

33. Section 1(9) of the APSG states that "Covered Instrument Validity Period" "means the validity period of a Bank Instrument or Bank Instructions covered under this [APSG], as set out by EDC in the confirmed Request for Cover[.]" Ex. C, p. 3. The Requests for Cover (which were attached to EDC's claim) are submitted as Exhibit F and should be deemed incorporated by reference in the Complaint or, alternatively, judicially noticed.

34. The Debtors allege, referring to LOC No. BMTO806369OS, that "[o]ne invoice was dated January 21, 2024, a date entirely outside and before the stated coverage period." Complaint, ¶ 26; Ex. G, p. 16 (invoice in question). But section 2(1) of the APSG only required that the "*demand for . . . payment* was made within the Covered Instrument Validity Period[.]" Ex. C, p. 4. It did *not* require Marubeni's *invoice dates* to fall within the coverage period. And all of Marubeni's "demands for payment" *were* made within the coverage period, as shown:

| **LOC Number** | **Covered Instrument Validity Period** | **Date of Marubeni's demand(s)** |
|---|---|---|
| BMTO806**047**O5<br>Ex. E, at pp. 1–5 | May 7, 2024 – April 30, 2025<br>Ex. F, at p. 5 | April 23, 2025<br>Ex. G, at pp. 7 & 11 |
| BMTO806**449**OS<br>Ex. E, at pp. 6–10 | May 7, 2024 – April 30, 2025<br>Ex. F, at p. 3 | April 23, 2025<br>Ex. G, at pp. 1 & 6 |
| BMTO806**369**OS<br>Ex. E, at pp. 11–15 | June 7, 2024 – May 30, 2025<br>Ex. F, at p. 1 | May 2, 2025 (Ex. G, at pp. 12 & 17)<br>May 12, 2025 (Ex. G, at pp. 18 & 22) |

35. In other words, all Marubeni's payment demands *were* made within the Covered Instrument Validity Period in "strict compliance" with section 2(1) of the APSG.

36. Quibbling over Marubeni's $58,756.70 interest-only draw (Ex. G, p. 18), the Debtors allege that "[n]o portion of the USD $4,872,197.22 principal arose under [LOC No.] BMTO806369OS [and] [a]ccordingly, the amount drawn did not constitute funds due pursuant to unpaid invoice or invoices for the supply [*sic.*] within the meaning of SBLC BMTO806369OS." Complaint, ¶ 28 (apparently referring to LOC No. BMTO806369OS, at Ex. E, p. 13, ¶ 1).

37. But again, all that mattered was that BMO was presented with invoices marked "unpaid" that *said* payment was due within 120 days from the bill of lading date. There was nothing else BMO should (or *could*) have done before honoring Marubeni's draws. And unlike the others, LOC No. BMTO806369OS allowed "multiple" draws. Ex. E, p. 13, last sentence.

38. Also quibbling about this interest-only draw, the Debtors query why Marubeni's invoice sought "$75,113.04, whereas BMO paid, and EDC now seeks to recover, only USD $58,756.70, with no explanation in the materials produced for the difference of approximately USD $16,000." Complaint, ¶ 28, referring to the invoice at Ex. G, p. 21, and Marubeni's related draw for $58,756.70, at Ex. G, p. 18. This interest-only draw was Marubeni's second on LOC No. BMTO806369OS. *See*, Ex. G, p. 12 (previous draw for $4,941,243.30). Adding those sums together equals exactly $5,000,000.00, which was the total credit available under LOC No. BMTO806369OS. *See*, Ex. E, pp. 11–12. No "materials" were missing for this explanation.

39. Finally, the Debtors allege that two claims BMO made to EDC for $4,872,197.22 "did not include the shipment-date documentation required by APSG Schedule B to establish that the underlying payments were timely" and "EDC should not have made payment [to BMO] on account of these Claims." Complaint, ¶ 29. This allegation restates an argument from a letter of the Debtors' district court counsel which should be deemed incorporated by reference or judicially noticed. *See*, Complaint, ¶ 76 ("EDC refused to address [the Debtors'] detailed

objections raised in [their] September 4, 2025, letter and filed suit the very next day. Section 3(4) [of the Indemnity] cannot insulate EDC's bad-faith conduct.")

40. The Debtors' September 2025 letter was sent in the middle of Mr. Li's fraudulent transfers and played a key role in "hindering or delaying" EDC within the meaning of FUFTA. *See*, timeline of fraud, Dkt. # 280, ¶ 49. For present purposes though, the Debtors' letter, and now their Complaint, misunderstand the nature of a letter of credit transaction by saying:

> **Timing and Due Date:** Similar to claim 172487, we need to verify that the beneficiary's demands under these two LCs were made only after the 120-day payment term had fully elapsed. Without the Bills of Lading or shipment dates for these invoices, we cannot independently confirm that the draws were timely and in accordance with the credit terms. We would like confirmation of the exact shipment dates and the resulting invoice due dates for these claims. Providing the Bill of Lading dates (or other evidence of shipment) for the goods and the contractual due date for payment will help settle this question. We ask EDC to obtain those details from BMO if they are not already on file. *See*, Ex. H, p. 7 (September 4, 2025, letter from Debtors), and *compare*, Complaint, ¶¶ 29–30.

41. But once again, BMO had no duty (or right) to analyze whether or when payment to Marubeni was *actually* due, or when its goods were shipped to Sinobec Trading. *Compare*, Ex. G, pp. 4–5 (Marubeni invoices *with* bill of lading dates), *with* Ex. G, pp. 15–16 (Marubeni invoices *without* bill of lading dates). Upon receiving the "beneficiary's signed statement" and a "copy of invoice(s) marked unpaid . . . *stating* payment due within 120 days from the bill of lading date," BMO *had* to honor the draws. *See*, ¶¶ 27–28, *supra.* That is how a letter of credit works. *See generally*, *Great Wall De Venezuela*, 117 F. Supp. 3d at 484.

42. In sum, the Debtors failed to plausibly allege that EDC was "grossly negligent" in paying BMO's claims, and the plain language of the relevant contracts precludes them from doing so. Thus, their Breach of Contract Claims should be dismissed *with* prejudice.

**2. The Debtors' constructive fraud claims are irreconcilable with their corporate counsel's judicial admissions and, alternatively, are inadequately pled.**

43. The Debtors' constructive fraud claims (Counts 1–4) should be dismissed *with* prejudice because they are irreconcilable with their corporate counsel's prior judicial admission. Plausible repleading is not possible due to that admission. Point A, *infra*. Alternatively, these claims should be dismissed without prejudice because, apart from identifying the Indemnity, they rest on mere recitals of the legal elements of a constructive fraud claim. Point B, *infra.*

**A. The Debtors' allegations that they got no value from the Indemnity should be dismissed with prejudice due to their counsel's judicial admissions.**

44. The Debtors' constructive fraud claims all rest on some version of an allegation that they "received no funds, no credit, no goods, no services, no contractual rights, no improved terms, no supply guarantees, and *no economic benefit of any kind*" from signing the Indemnity." Complaint, ¶ 38; *see also*, Complaint, ¶¶ 43, 48, & 54 (*verbatim* allegations).

45. These allegations are irreconcilable with their corporate counsel's judicial admission in the parties' prepetition action. EDC maintains this requires dismissal *with* prejudice. At a minimum though, the diametric inconsistency between the Debtors' allegations and their counsel's judicial admission 3 weeks before the petition date renders these allegations implausible, and they should be repled to account for this inconsistency, if that's possible.

46. As noted, the Debtors repeatedly allege that they got *no value whatsoever* from the Indemnity. *See*, Complaint, ¶ 1 ("Succinctly stated, the core obligations at issue arise under an indemnity agreement . . . the effect of which was to pile on $25,000,000 of debt liability for no consideration or value in return[.]"; ¶ 13 ("EDC demanded that Plaintiffs be added as co-indemnitors notwithstanding the lack of any consideration or value flowing to either Plaintiff."); *see also*, ¶¶ 38, 43, 48, 54, & 71 (similar allegations claiming *no consideration whatsoever*).

47. Even on a dismissal motion, "courts . . . need not accept . . . facts which run

counter to facts of which the court can take judicial notice[.]" *Warren Tech.*, 2018 WL 10550930, at *7 n. 1, *aff'd*, 962 F.3d 1324; *see also*, *Anthony Sterling, M.D. v. Provident Life & Acc. Ins. Co.*, 519 F. Supp. 2d 1195, 1208 (M.D. Fla. 2007) (same); *Campos v. I.N.S.*, 32 F. Supp. 2d 1337, 1343 (S.D. Fla. 1998) (same).

48. During oral argument on EDC's prepetition injunction motion against the Debtors three weeks before the petition date, their counsel unequivocally stated as follows:

> Judge, the largest supplier from [*sic.*] Marquis Solar Frame Works was the Sinobec Group. That's the . . . parent entity that declared bankruptcy in Canada. Once that entity went belly up, Marquis Solar needed to find new suppliers. *See*, Ex. I, at 6:08–12.

49. The signature pages of the Indemnity identify Sinobec Group, Inc. as the primary obligor.[24] As such, Debtors' counsel's prior statement clearly "runs counter" to their present allegations that they got *nothing* of value from the Indemnity. And the same lawyer who made this admission appeared in this case and described himself as Debtors' "corporate counsel."[25]

50. The Court should take judicial notice of the district court hearing transcript, which also appears in this Court's files. *See*, *Ryzhov v. Mayorkas*, 634 F. Supp. 3d 1107, 1111 (S.D. Fla. 2022) ("[a] district court may take judicial notice of public records within its files relating to . . . other related cases."); *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811–12 (11th Cir. 2015) (trial court properly considered hearing transcript from another case under Rule 12(b)(6)).

51. Moreover, unlike some records, which are not judicially noticed for their truth, Debtors' counsel's statement is a *binding* judicial admission. *Cf.*, *Crmsuite Corp. v. Gen. Motors Co.*, 2021 WL 914170, at *3 n. 6 (M.D. Fla. Mar. 10, 2021) (noting in dismissal motion that "[s]tatements of counsel made at oral argument are often considered admissions that bind the

---

[24] Dkt. # 150-4, at ECF p. 4 (signature pages of Indemnity Agreement).
[25] Dkt. # 64, at 3:22–25 (Ramsey Villalon, Esq. appearing as the Debtors' "corporate counsel").

represented party."); *Halifax Paving, Inc. v. U.S. Fire Ins. Co.*, 481 F. Supp. 2d 1331, 1336 (M.D. Fla. 2007) ("Statements made by an attorney during oral argument are binding judicial admissions and may form the basis for deciding summary judgment.") (*citing, McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 680 (7th Cir.2001) ("The verbal admission by [defendant's] counsel at oral argument is a binding judicial admission, the same as any other formal concession . . . ").

52. "As the Eleventh Circuit recognizes, 'judicial admissions are proof possessing the highest possible probative value.'" *Tri-Lady Marine*, 2018 WL 10466997, at *3, *aff'd*, 763 F. App'x 882. "Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them." *Id.*

53. At an absolute minimum, the Debtors' corporate counsel's prior statement is irreconcilable with their current allegations and strips them of the entitlement to the presumption of truth. *Cf.*, *Warren Tech.*, 2018 WL 10550930, at *7 n. 1, *Anthony Sterling, M.D.*, 519 F. Supp. 2d at 1208; *Campos*, 32 F. Supp. 2d at 1343. Thus, even if the Court deems dismissal *with* prejudice inappropriate, the Debtors should have to replead in a manner that renders their current allegations plausible notwithstanding their corporate counsel's prior statement.

54. That is especially important given how hard it is, as a substantive matter, for the Debtors to plausibly allege they didn't get "value" from the Indemnity. *See generally*, *In re TOUSA, Inc.*, 444 B.R. 613, 655–62 (S.D. Fla. 2011) (adopting broad definition of "value," especially for corporate affiliates), *rev'd in part on other grounds*, 680 F.3d 1298 (11th Cir. 2012); *see also*, *In re PSN USA, Inc.*, 615 F. App'x 925, 930 (11th Cir. 2015) (same).

55. In *TOUSA*, the district court (whose legal analysis was *not* reversed and is consistent with the Eleventh Circuit's comments in *PSN, supra*) noted that "[t]he Seventh Circuit [has] recognized that requiring a direct flow of capital to a cross-guarantor . . . may well be

inhibitory of contemporary financing practices, and that often such guarantees . . . are legitimate business transactions, and are not made to frustrate creditors." 444 B.R. at 659 (*quoting*, *In re Image Worldwide, Ltd*., 139 F.3d 574, 578-79 (7th Cir. 1998) (noting that courts have enforced a debtor's guarantee "when the loan strengthened the corporate group as a whole, so that the guarantor . . . would benefit from 'synergy' within the . . . group" or when "the guaranty . . . may safeguard an important source of supply . . . for the guarantor.")

56. "One theme permeates the authorities upholding guaranty obligations: that the guaranty . . . was the result of arm's length negotiations at a time when the common enterprise was commercially viable." *Image Worldwide,* 139 F.3d at 578 (*quoted with approval by*, *TOUSA*, 444 B.R. at 659). EDC is an arm's-length creditor, and the Debtors do not allege they and the Sinobec Entities were not a viable enterprise when the Indemnity was signed.

57. Particularly given Mr. Li's refusal to provide evidence in his and the Sinobec Entities' control, it is respectfully submitted that the inconsistency between the Debtors' allegations and their corporate counsel's judicial admission renders their allegations, in their current form, implausible. If not dismissed with prejudice, they should at least be repled to account for this factually diametric – and legally dispositive – inconsistency.

**B. Several allegations indispensable to the Debtors' constructive fraud claims merely recite the legal elements and should be repled to allege relevant facts.**

58. EDC does not assert constructive fraud claims must comply with Rule 9(b). Still, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice[.]" *Warren Tech,* 962 F.3d at 1327. Key allegations that are indispensable to the Debtors' constructive fraud claims are based on exactly such recitals.

59. One court could have been talking about the Debtors' complaint when it held that:

> Absent the following facts, [plaintiff's] Complaint fails to state a plausible claim to recover a constructive fraudulent transfer under § 544(b) and [California's equivalent of Fla. Stat. §§ 726.105(1)(b) and 726.106(1)]:
> ***
> 3. Facts that form the basis for [plaintiff's] assertion that 'the Debtors were actually insolvent at the time the Constructive Fraudulent Transfers were made to each of the Defendants.'
> 4. Facts that form the basis for [plaintiff's] assertion that 'the Debtors were (i) insolvent when the Constructive Fraudulent Transfers were made to the Defendants, or became insolvent as a result of the Constructive Fraudulent Transfers made to the Defendants; or (ii) engaged in business or a transaction, or were about to engage in a business or a transaction, for which the property remaining with the Debtors after the Constructive Fraudulent Transfers were made constituted unreasonably small capital; or, in the alternative, (iii) at the time the Constructive Fraudulent Transfers were made, the Debtors intended to incur, or believed they would incur, debts that would be beyond the Debtors' ability to pay as they matured.' *In re SCI Real Est. Invs., LLC*, 2013 WL 1829648, at *6–7 (Bankr. C.D. Cal. May 1, 2013)

60. In virtually identical terms, the Debtors' Complaint simply recites the same elements of a constructive fraud claim under FUFTA and 11 U.S.C. § 548, without any supporting facts. *See*, Complaint, ¶ 37 (no facts concerning, for example, the Debtors' alleged insolvency, their remaining assets or capital, their other debts, or which creditor(s) had allowable unsecured claims), ¶ 42 (Count 2, same allegation for Marquis Solar), ¶ 49 (Count 3), ¶ 55 (Count 4). These claims should be repled to allege relevant facts. *Cf.*, *SCI Real Est.*, *supra.*

61. Many allegations also consist of lengthy run-on sentences with conjunctions, disjunctions, and footnotes. Upon repleading, the Debtors should be ordered to comply with Rule 8(d)(1). *See*, *Hunt v. Caliber Home Loans, Inc*., 2018 WL 10799004, at *1 (S.D. Fla. Mar. 6, 2018) ("Rule 8(d)(1) requires that each allegation . . . be 'simple, concise, and direct.'")

**C. The Debtors' claims under 11 U.S.C. § 548 are duplicative of their claims under FUFTA and should also be dismissed for that reason.**

62. The Debtors' constructive fraud claims under FUFTA and 11 U.S.C. § 548 seek identical relief, *i.e.*, avoiding their obligations under the Indemnity. *Compare*, "Wherefore" clauses at Complaint, ¶ 39 (Count I under FUFTA for Marquis Holding); ¶ 44 (Count II under FUFTA for Marquis Solar); ¶ 50 (Count III under § 548 for Marquis Holding); ¶ 56 (Count IV under § 548 for Marquis Solar). And their 11 U.S.C. § 502(d) claims are asserted in Count V.

63. Moreover, the litigation of these claims involves substantially identical legal principles. *See e.g.*, *In re ATIF, Inc.*, 2021 WL 6060011, at *10 (Bankr. M.D. Fla. Dec. 2, 2021), *aff'd*, 2023 WL 2013524 (M.D. Fla. Feb. 15, 2023), *aff'd*, 2025 WL 3264492 (11th Cir. Nov. 24, 2025) ("Fraudulent transfer claims under FUFTA are analogous 'in form and substance' to those under [the bankruptcy code] and they are frequently analyzed contemporaneously.")

64. As such, the Debtors' claims under FUFTA (or 11 U.S.C. § 548) should be dismissed *with* prejudice. *Cf.*, *Belmonte v. Creative Props., Inc.*, 2019 WL 5063832, at *1 (S.D. Fla. Oct. 8, 2019) ("Counts I and II stem from identical factual allegations. [] For this reason alone, Count II should be dismissed."); *A&M Mgmt. Inc. v. Deme*, 2019 WL 7344821, at *5 (S.D. Fla. May 14, 2019) ("The Court agrees . . . that Plaintiffs' claim for money had and received is due to be dismissed as duplicative of their unjust enrichment claim.").

**3. EDC was not validly served in compliance with 28 U.S.C. § 1608(b).**

65. First and foremost, EDC emphasizes it would have accepted informal service of the complaint if Mr. Li was not refusing to submit to discovery in this action. EDC regrets invoking legal technicalities that will delay the allowance of its claim. But the truly regrettable technicality here is that Mr. Li gets to control the Debtors and this action from Canada, while the

Debtors' get to claim they "have zero control over" Mr. Li.[26]

66. The Debtors want *expedited* discovery from EDC.[27] That could only relate to their Breach of Contract Claims, which are baseless. Point 1, *supra*. Meanwhile, the evidence EDC needs to defend itself against the Debtors' constructive fraud claims is in Mr. Li's and the Sinobec Entities' possession. In other words, the Debtors would like EDC to be hung out like a piñata to be flogged with pointless discovery for their doomed Breach of Contract Claims while they advance their chapter 11 plan and EDC is stuck spinning its wheels in this action.

67. To try to mitigate the unfairness of this jurisdictional gamesmanship by the Debtors and Mr. Li, EDC is requesting a transfer of venue. Point 4, *infra*. In the interim, EDC cannot waive its limited protections under the Foreign Sovereign Immunities Act ("FSIA").

**A. The "plain meaning rule" of statutory interpretation dictates that 28 U.S.C. § 1608 applies in this action.**

68. The FSIA defines a "foreign state" to "include[] . . . an agency or instrumentality of a foreign state[.]" 28 U.S.C. § 1603(a). The Debtors admits "EDC [is] an agency or instrumentality of a foreign state[.]" Complaint, p. 4, n. 2. Thus, even if formal process was validly served under the FSIA (which it wasn't), EDC's response in this action isn't due until 60 days *after* such valid service. *See*, 28 U.S.C. § 1608(d), made applicable by Fed. R. Bankr. P. 7004(a)(1) and Fed. R. Civ. P. 4(j)(1).

69. Specifically, 28 U.S.C. § 1608(d) provides that "[i]n any action brought in a court of the United States . . . an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading . . . within sixty days after service has been made under this section."

70. Despite admitting EDC is a foreign state under the FSIA, the Debtors say §

[26] Dkt. # 85, at 15:04–17 (February 26, 2026, hearing of Debtors' DIP financing motion).
[27] Adv. Dkt. # 6-1, p. 1 (June 4th email from Debtors' counsel).

1608(d) has no application because (1) the words "any action" in § 1608(d) somehow exclude *this* action, and (2) the word "complaint" in § 1608(d) does not include an adversary complaint concerning a proof of claim.

71. The "plain meaning rule" of statutory interpretation conclusively disposes of the Debtors' efforts to rewrite § 1608(d). As this Court has held, "Courts interpreting statutory text must begin – and, if possible, end – with the plain meaning of the statute." *In re Robb*, 669 B.R. 839, 843 (Bankr. S.D. Fla. 2025). The application of that rule to § 1608 couldn't be easier.

72. The Debtors try to rewrite the plain meaning of § 1608(d) by arguing the word "complaint" should be disregarded because their "complaint" is actually a "counterclaim" under 28 U.S.C. § 1607.[28] Agreeing with the Debtors about this requires the Court to jettison the plain meaning rule and accompany the Debtors on an excursion in sophistry that no other court has ever even come close to embarking on when construing *any* pleading statute.

73. Aside from the plain meaning of § 1608(d), Rule 7, incorporated by Bankruptcy Rule 7007, defines what constitutes a "pleading." Fed. R. Civ. P. 7(a). It "explicitly excludes everything else from its definition[.]" *In re Bal Harbour Quarzo, LLC*, 638 B.R. 660, 668 n. 51 (Bankr. S.D. Fla. 2022). Thus, "[m]otions, briefs, . . . objections, responses, joinders, and other ancillary papers are not 'pleadings.'" *Id.* Likewise, proofs of claim are not "pleadings" (whether "complaints" or "counterclaims") under the federal rules of civil procedure.

74. If the Debtors' argument about § 1608 was correct – *i.e.*, that an adversary complaint concerning a proof of claim is really a "counterclaim" *for pleading purposes* – ordinary creditors would not get 30 days to respond to complaints under Fed. R. Bankr. P. 7012(a)(1). They would only get 21 days under Fed. R. Bankr. P. 7012(a)(4)(A). No plaintiff

[28] Adv. Dkt. # 12, at p. 10, ¶ 2.

would make such an argument in that context.

75. Similarly, Bankruptcy Rule 7012(a)(5)(A) provides that "[t]he United States or its . . . agency must serve [] an answer to a complaint within 35 days . . . " If the Debtors' theory was correct (*i.e.*, that a complaint directed at a proof of claim is a "counterclaim" *for the purposes of pleading statutes*), then every time an adversary proceeding is filed to unseat an IRS tax lien, the government would lose its 35-day response time.

76. Of course, "[t]here is an absurdity exception to the plain meaning rule, but it . . . comes into play only where the result of adhering to the plain meaning rule . . . is clearly absurd[.]" *United States v. Nix*, 438 F.3d 1284, 1286 (11th Cir. 2006). There is nothing "clearly absurd" about interpreting the word "complaint" in 28 U.S.C. § 1608(d) to include adversary "complaints," or interpreting the words "any action" to include this action.

**B. The Court lacks personal jurisdiction because EDC was not validly served in compliance with 28 U.S.C. § 1608(b).**

77. The Debtors admit that "[i]mmunity and service are independent inquiries: even where an exception strips a foreign state of immunity, jurisdiction also requires service in conformity with the FSIA."[29] EDC does not maintain it is immune from suit. But it *does* have to be validly served. And "the FSIA provides the *sole* basis for obtaining jurisdiction over a foreign state[.]" *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989) (distinguished in context of Helms-Burton Act by *Exxon Mobil Corp. v. Corporacion Cimex, S. A. (Cuba)*, No. 24-699, 2026 WL 1791259, at *11, 609 U.S. __ (2026).

78. "First, district courts have [subject-matter] jurisdiction under [28 U.S.C. § 1330(a)] when any of the FSIA's immunity exceptions applies." *CC/Devas (Mauritius) Ltd. v.*

[29] Adv. Dkt. # 12, at p. 9, Point A, ¶ 2.

*Antrix Corp.*, 605 U.S. 223, 232 (2025). "Second, 'service has been made under section 1608' when a plaintiff complies with the FSIA's specialized service-of-process rules." *Ibid.* Only "[w]hen both criteria are satisfied, the statute declares that personal jurisdiction 'shall exist[.]'" *Ibid.* In other words, "subject matter jurisdiction *plus* service of process equals personal jurisdiction.'" *Id.*, at 223 (emphasis added).

79. Unless the Court jettisons the plain meaning rule and distinguishes this Supreme Court precedent, § 1608(b) contains the *only* authorized methods of service for EDC. The Debtors admit § 1608(b)(1) does not apply because "[n]o . . . 'special arrangement' exists between EDC and Plaintiffs."[30] As for § 1608(b)(2), only five people are "authorized by appointment or by law" to receive process for EDC and none of them are located in the United States.[31] The Debtors could have sought jurisdictional discovery to identify these people but did not.[32] EDC assumes there was a strategic reason for this.

80. Instead of requesting the names of EDC's authorized agents, the Debtors sent a flurry of mailings to various addresses, inside and outside EDC, without naming *any* recipients. EDC has 2,200 employees in 16 offices across Canada.[33] This sort of scattershot service is not valid under the FSIA (or in any other context).

81. EDC expects the Debtors to argue that service was made by FedEx or mail under the Hague Convention and this is "in accordance with an applicable international convention" under § 1608(b)(2). EDC concedes that process *could* have been served this way *if* it was sent to one of the five individuals authorized to accept service for EDC. Again, that didn't happen. And

---

[30] Adv. Dkt. # 12, at p. 8, last paragraph.
[31] Mannion Dec., ¶ 2.
[32] Mannion Dec., ¶ 3.
[33] Mannion Dec., ¶ 2.

for reasons known only to Mr. Li, it wasn't even attempted.

82. An unidentified person apparently signed for a delivery to the Office of the Deputy Attorney General of Canada. Adv. Dkt. # 16, p. 20. Nobody at that office is authorized to accept service for EDC. Similarly, a "BBARRY" apparently received a FedEx delivery at one of EDC's 16 Canadian offices. Adv. Dkt. # 16, p. 21. Nobody with "Barry" in their name is authorized to accept service for EDC.[34] And an unidentified person at EDC apparently signed a mailing receipt on June 23, 2026. Adv. Dkt. # 16, p. 12. Whoever that was, it was not one of EDC's authorized personnel.[35] And "[a] defendant's actual notice is not sufficient to cure defectively executed service." *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007).

83. Whatever method of service the Debtors maintain they used, under 28 U.S.C. § 1608(c)(2), "[s]ervice shall be deemed to have been made . . . as of the date of receipt indicated in the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed." None of EDC's authorized personnel signed for any of the mailings identified in the Debtors' certificate of service, Adv. Dkt. # 16.[36]

84. On July 20, 2026, in an apparent attempt to serve EDC under § 1608(b)(3)(B), the Debtors filed an *Ex Parte* Motion for a Ministerial Order Directing Clerk-Issued Service By International Mail/Courier. That Motion only identified one proposed service recipient (and used only their first name). *See*, Adv. Dkt. # 19, at p. 6. The person identified ("Marie-Hélène") is not among the five people authorized to accept service for EDC[37] and no certificate of service has been filed for these mailings as required by § 1608(c)(2).

[34] Mannion Dec., ¶ 2.
[35] Mannion Dec., ¶ 2.
[36] Mannion Dec., ¶ 2.
[37] Mannion Dec., ¶ 2.

85. If the Debtors had sought jurisdictional discovery to identify the people at EDC who are authorized to accept service, they would have been served by now. EDC assumes Mr. Li's Canadian counsel had some reason for not doing that. And again, if the Debtors simply agreed to accept service for Mr. Li, none of this would be in dispute. He is their owner[38] and *de facto* CEO.[39] The only reason he is not their *nominal* CEO is because he didn't want to testify about the Debtors' Breach of Contract Claims or his fraud in the parties' prepetition action.[40]

86. The Debtors are still in contact with him[41] and he is most likely directing this action through his Canadian counsel.[42] EDC maintains he is using this action to harass its employees and inundate its counsel with busy work so he can confirm a chapter 11 plan before EDC fully exposes his abuse of the bankruptcy code. As part of that strategy, he is withholding all evidence (all in *his* control) that EDC needs to refute his constructive fraud claims, while he is free to harass EDC with discovery concerning the Debtors' pointless Breach of Contract Claims.

87. But "an individual or entity is not obliged to engage in litigation unless officially notified of the action . . . by formal process." *De Gazelle Grp., Inc. v. Tamaz Trading Establishment*, 817 F.3d 747, 749 (11th Cir. 2016). And faced with this uneven playing field, EDC is forced to insist on its rights under the FSIA in the hope the Court fixes this inequity soon.

---

[38] Dkt. # 280-8, ECF p. 57 (organizational chart in 2025 forensic report of CCAA Monitor).

[39] Dkt. # 96-2, at 22:11–25:15 (Ms. Niu's testimony at meeting of creditors showing how Mr. Li dominated the Debtors' postpetition financing proposal).

[40] Dkt. # 280, ¶¶ 147–155 & 159 (EDC's motion for a chapter 11 trustee).

[41] Dkt. # 128, p. 13, ¶ 2 ("interactions with Mr. Li have generally been in his operational capacity as former President of the Debtors and . . . as an employee of the . . . Canadian affiliate . . . ").

[42] *See e.g.*, Dkt. # 128, at ECF p. 13, ¶ 2 ("communications concerning intercompany . . . transfers have been conducted exclusively with Canadian counsel, not with Mr. Li himself."); Uzzi Report, Dkt. # 219, at ECF pp. 10, 17, 22, 27, 31, 40, 52, 55, & 58–59 (fourteen references to "[a]ccording to counsel to the Related Parties").

**4. Because EDC can't subpoena Mr. Li in Canada and this Court can't enforce such a subpoena, venue should be transferred to Plattsburgh, New York.**[43]

88. As the district court noted in the parties' prepetition injunction proceedings, "as to any likelihood of success, [Mr. Li] will be the crucial witness *for both sides*."[44] And as the parties' emails show, he was personally involved in the discussions leading up to the Debtors' execution of the Indemnity, which he signed.[45] As the CEO and owner of the Sinobec entities,[46] he also has control of the records EDC needs to defend this action. And like this entire chapter 11 case, this action will have no evidentiary integrity without Mr. Li's participation.

89. But the Debtors say they "have zero control over" him[47] even though they admit EDC is entitled to depose him in this action.[48] EDC can't subpoena him in Canada. *Compare*, *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 262 F.R.D. 293, 305 (S.D.N.Y. 2009) ("foreign nationals living abroad are not subject to subpoena service outside the United States."), *with id*, at 307 (foreign *corporations* can be subpoenaed under Hague Convention); *see also*, *In re Three Arrows Cap., Ltd.*, 647 B.R. 440, 449 (Bankr. S.D.N.Y. 2022) ("while [*In re Procom Am., LLC*, 638 B.R. 634, 644 (Bankr. M.D. Fla. 2022)] did involve service of a subpoena on a non-resident alien . . . that service was made in the United States on the non-resident's lawyer[.]"). And the Debtors refuse to accept service for Mr. Li.

90. The Debtors' assertions that EDC can just FedEx a subpoena to Mr. Li under the

---

[43] EDC is moving for a venue transfer now to preserve that defense under Rule 12(h), and with full reservation of its rights concerning the Court's lack of personal jurisdiction under the FSIA.

[44] Dkt. # 96-3, at ECF p. 32:15–20 (December 11, 2025, district court hearing transcript).

[45] Dkt. # 159-8, at pp. 7–10, 14–15, 20–24, & 26 (emails from Mr. Li highlighted yellow); Ex. A, at p. 7 (signature pages of Indemnity Agreement).

[46] Dkt. # 159-7, ¶ 1 & n. 1; *see also*, ¶ 15 and signature block at p. 16 (Mr. Li's declaration filed in CCAA chapter 15 recognition proceedings); *see also*, Dkt. # 280-8, ECF p. 55 (organizational chart in 2025 forensic report of CCAA Monitor).

[47] Dkt. # 85, at 15:04–17 (February 26, 2026, hearing of Debtors' DIP financing motion).

[48] Mannion Dec., ¶ 4.

Hague Convention[49] are not just legally wrong, *Aristocrat Leisure*, 262 F.R.D. at 305–07, they are factually disingenuous. It is undisputed that Mr. Li chose to file this chapter 11 case rather than be deposed.[50] Before that, he resigned as the Debtors' CEO to avoid being deposed. As the district court put it, "there is at least . . . reason to think [he] had a substantial role in all of this and has now relinquished his . . . officer positions . . . so that he doesn't have to volunteer information[][51]" and "I'm not impressed by efforts to wall him off in whatever fashion has occurred" and "I expect him to make himself available for a deposition."[52]

91. Even if the Debtors genuinely believed that, despite this history, Mr. Li would suddenly comply with a subpoena he gets in the mail, his Canadian lawyers could send him text messages with answers, tell him not to answer questions they don't like, or have him walk out. This Court could do nothing about it. *See*, Fed. R. Civ. P. 45(f)–(g); *In re Kirkland*, 75 F.4th 1030, 1044 (9th Cir. 2023) ("neither the text of the rules nor the advisory committee's notes establish that the 100-mile limitation is inapplicable to remote testimony or that the 'place of compliance' under Rule 45 changes the location of the trial or other proceeding to where the witness is located when a witness is allowed to testify remotely.")

92. The parties' and the Court's resources have now been wasted on 7 motions and

---

[49] Dkt. # 179, at 41:19–42:06 ("I personally think that he could do it by FedEx . . . [w]e're not going to object[.]"); Dkt. # 266, at 40:23–41:08 ("I laid out . . . how [EDC] could actually get service . . . and we want . . . to get past this hurdle . . . There's nothing wrong with FedEx.").
[50] Ex. I, at p. 11:04–07 (district court saying on December 30, 2025, that "if he doesn't make himself available for deposition before the preliminary injunction hearing . . . that will be . . . on him and [the Debtors]."); Dkt. # 96-2, at 17:11–21 (Marquis Solar's COO saying this case was filed because of EDC's prepetition action); Dkt. # 27-3, p. 3, ¶ 1 (district court's T.R.O. scheduling final injunction hearing for January 21, 2026, the day after the petition date).
[51] Dkt. # 96-3, at 10:08–12 (December 11, 2025, district court hearing transcript).
[52] Ex. I, at p. 11:17–19 (December 30, 2025, district court hearing transcript).

seven hours of hearings[53] necessitated mainly by Mr. Li's refusal to appear. Those motions will multiply dramatically in this action. For example, without Mr. Li's participation, EDC's only avenue of defense will be to seek terminating evidentiary sanctions against the Debtors. That will necessitate a slew of motions to compel, motions for sanctions, and related hearings.

93. There is one potential solution to this enormous waste of time and money, and the unfairness to EDC (and the Debtors, if their constructive fraud claims are legitimate). Mr. Li lives and works in Montreal,[54] which is within 100 miles of the Plattsburgh Division of the United States District Court for the Northern District of New York. In fact, one of the Sinobec Entities had a place of business in Plattsburgh[55] and the Debtors' accountants are there.[56]

94. If venue is transferred to Plattsburgh, EDC can renew its motion for substituted service of Rule 45 subpoenas on Debtors' counsel (or this Court can reconsider it *sua sponte*) and EDC can potentially depose Mr. Li in Plattsburgh *and* have its subpoena enforced under Rule 45(g). A venue transfer is also the *only* way he can be subpoenaed to testify at any trial.

95. "A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412, made applicable by Bankruptcy Rule 7087. "[A]lthough courts cite myriad factors in determining whether to transfer a case under § 1412[,]" *Alderwoods Grp., Inc. v. Garcia,* 682 F.3d 958, 973–74 (11th Cir. 2012), it is respectfully submitted that the Plattsburgh court's ability to compel trial and deposition testimony and document production from Mr. Li and the Sinobec

---

[53] Dkt. # 96 (EDC's substituted service motion); Dkt. # 139 (Debtors' motion to quash subpoena to Mr. Villalon); Dkt. 210 (Perfect Gateway's protective order motion); Dkt. # 280 (motion for a chapter 11 trustee); Adv. Dkt. # 6 (EDC's prior motion for recognition of its rights under § 1608(d)); Adv. Dkt. # 10 (Debtors' motion for briefing extension reducing EDC's reply time).
[54] *See*, Dkt. # 107, ¶¶ 2–4 (declaration of service of briefing order by FedEx on Mr. Li).
[55] Dkt. # 150-4, at ECF p. 5 (signature page of Indemnity for Marquis Metal Material, Inc.).
[56] Dkt. # 60-1 (Debtors' retainer agreement with The Hoffman Eells Group, CPAs, P.C.)

Entities is paramount. And considering the amount of litigation that will result in this Court if venue is *not* transferred, the preservation of resources strongly supports a venue transfer.

Dated: August 5, 2026

Respectfully submitted,

BLAKELEY LC
530 Technology Dr. First Floor
Irvine, CA 92618
DMannion@BlakeleyLC.com
Telephone: (949) 260-0611

By: */s/ David M. Mannion*
David M. Mannion (*pro hac vice*)
New York Bar No. 4472486
California Bar No. 288627

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY on August 5, 2026, a true and correct copy of foregoing was electronically filed with the Court using the CM/ECF system, which sent notification and was electronically served upon all parties in interest participating in the CM/ECF system in this case.

By: */s/ David M. Mannion*
DAVID M. MANNION